1    Frank S. Hedin (SBN 291289)
     E-mail: fhedin@hedinhall.com
2    David W. Hall (SBN 274921)
     E-mail: dhall@hedinhall.com
3    HEDIN HALL LLP
     Four Embarcadero Center, Suite 1400
4    San Francisco, CA  94104
     Telephone: (415) 766-3534
5    Facsimile: (415) 402-0058
6
7    *Counsel for Plaintiff and the Putative Classes*

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10                       **SACRAMENTO DIVISION**

11

12   BILL HANSEN, individually and on behalf of      Case No. 2:19-cv-00179-KJM-DMC
     all others similarly situated,
13                                                   **PLAINTIFF BILL HANSEN'S**
             Plaintiff,                              **OPPOSITION TO DEFENDANTS'**
14                                                   **MOTION TO COMPEL ARBITRATION**
15   v.

16   CPL ASSETS, LLC; LMB MORTGAGE
     SERVICES, INC.; DIGITAL MEDIA
17   SOLUTIONS, LLC,

18           Defendants.

19

20

21

22

23

24

25

26

27

28

Plaintiff Bill Hansen submits this response in opposition to the Motion to Compel Arbitration (ECF No. 23 ("Motion")) filed by Defendants LMB Mortgage Services, Inc. ("LMB") and CPL Assets, LLC ("CPL") and joined by Defendant Digital Media Solutions, LLC ("DMS"). [1]

## INTRODUCTION

LMB operates lead generation websites for subprime mortgage lenders. Unsatisfied with genuine leads from actual website visitors who actually submitted personal information through their intake pages, LMB along with CPL and DMS decided to manufacture leads by blasting text messages to millions of vulnerable consumers across the country who had not submitted information through their pages, including Plaintiff and countless others who had never even visited LMB's website. All of these unsolicited text messages – which contained advertisements for subprime loan referral services – were sent in clear violation of the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. 227, *et seq.*, because Defendants lacked the requisite prior express written consent to send any of them. Caught red handed, Defendants now attempt to duck class-wide liability by moving to compel Plaintiff into individual arbitration pursuant to an imaginary agreement to arbitrate that they say he signed on a webpage he never visited. The Motion is completely without merit and should be denied for at least four reasons.

<u>First</u>, LMB has failed to carry its threshold burden of demonstrating the existence of an agreement to arbitrate between Plaintiff and LMB. The purported agreement LMB invokes here is in the "Terms of Use" buried on the last intake page of its LowerMyBills.com website. Yet LMB presents no evidence whatsoever that Plaintiff ever visited that or any other LMB-affiliated website. Plaintiff, in contrast, attests unequivocally that he has never visited that website, much less clicked through its misleading intake page. On this dispute of fact alone, the Motion should be denied.

Recognizing this glaring flaw in its lead argument, LMB hedges: if not Plaintiff, it must have been Plaintiff's deceased mother, Willena Hansen, who clicked through the intake page. LMB has

---

[1] Defendant DMS filed a bare bones joinder in LMB and CPL's Motion with no analysis specific to DMS. ECF No. 26. The Motion should be denied in its entirety as to all three Defendants for all the reasons detailed below, as well as the fact that none of them even existed in their present form in 2014 when the agreement was purportedly formed; Nothing in the Terms of Use extends to successor entities. *See* ECF No. 23-3 at 28-32; *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013) (non-parties to arbitration agreements typically cannot enforce arbitration). Additionally, the Motion fails as to DMS in particular because DMS has made no showing whatsoever – no evidence, no argument, nothing – establishing that it is in fact an "affiliate" of LMB or otherwise entitled to enforce LMB's Term of Use. *See* ECF No. 26.

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

no evidence of that either. While LMB points to a series of screenshots from its lead generation website, containing an array of form fields, pertaining to a myriad of subjects, culminating in a button for submitting information into those numerous form fields, LMB has not submitted any evidence demonstrating that anyone, and certainly not Plaintiff or his mother, actually pressed the button. The materials submitted by LMB in support of the Motion merely reflect that certain information pertaining to Plaintiff's mother was inputted into the form (and/or harvested from other data sources, as discussed below in detail) – but these materials plainly do not show that the Plaintiff or his mother submitted any information to LMB by pressing the button at the end of the form. Because the Motion hinges on the button having been pressed (the occurrence of which LMB has not and cannot establish), the Motion fails to demonstrate Plaintiff's or his mother's (or anyone else's) assent to LMB's Terms of Service (or the arbitration clause therein). Mutual assent is an essential element to contract formation; without it there is no possible basis for LMB to compel arbitration in this case.

The reality is that neither Plaintiff nor his mother ever pressed the button. Together with this brief, Plaintiff submits evidence, including a sworn declaration and various materials concerning LMB's technology employed on the LMB website, which collectively demonstrates that neither Plaintiff nor his mother ever pressed the button on the final page of the LMB site to submit any information to LMB. Rather, LMB collected (or harvested from other sources) Plaintiff's mother's data in real time, as she navigated through and inputted certain non-personal information into LMB's website, even though she never actually submitted that inputted data by pressing the button. LMB then used that surreptitiously-extracted data to identify Plaintiff's mother as the person who inputted it and to locate Plaintiff's cellular telephone number as related to a person who lived at the same residence, and thereafter began bombarding Plaintiff with unsolicited text messages to that telephone number. This is corroborated by the experiences of numerous other similarly-situated persons who likewise received unsolicited text messages from LMB and related companies, who likewise visited LMB's website, navigated through the same form fields, declined to press the button on the final page, and nonetheless began receiving unsolicited text messages from LMB.

Because LMB has not demonstrated (and cannot demonstrate) that Plaintiff (or his mother) pressed the button, LMB has failed to (and cannot) establish that Plaintiff (or his mother) assented to the Terms of Use – a necessary element to the formation of a contract.

Second, even if LMB could somehow establish that Plaintiff's mother clicked the button (and it cannot), the Motion still fails because LMB cannot demonstrate that by clicking the button she (or

2

anyone else) would have thereby assented to the Terms of Use containing the arbitration provision on the LMB website.  The LMB website relied upon by LMB in the Motion is configured in such a deceptive manner, with such inconspicuous disclosures, that it could not have, as a matter of law, adequately put Plaintiff's mother or anyone else on notice of the Terms of Use, even if they had clicked the button (which neither Plaintiff nor his mother did).

Third, even if Plaintiff's mother had assented to the agreement to arbitrate in LMB's Terms of Use, only she and LMB would be parties to that agreement, Plaintiff would remain a non-signatory to the agreement, and LMB would accordingly not be entitled to compel Plaintiff to arbitrate his claims pursuant to the agreement.  Generally speaking, only signatories to an agreement can be compelled to arbitrate under that agreement. The three narrow exceptions to the rule that LMB cursorily invokes– that Plaintiff is equitably estopped from avoiding the agreement to arbitrate, that Plaintiff's mother was acting as his agent in visiting the LMB website and purportedly agreeing to arbitrate, and that Plaintiff is an intended third-party beneficiary to the purported agreement to arbitrate between his mother and LMB – are each plainly inapplicable here.  For one thing, the plain language of the Terms of Use does not identify Plaintiff as a party to the Terms of Use or the incorporated agreement to arbitrate.  Moreover, Plaintiff's statutory claims for violation of the TCPA do not arise out of the Terms of Use or the agreement to arbitrate, and Plaintiff has not knowingly exploited or directly benefited from the Terms of Use or the agreement to arbitrate in any way (nor could he, having never entered into or even known of any such purported agreement). Nor was Plaintiff's mother acting as his agent.  Whereas LMB presents no evidence (because there is none) that Plaintiff and his mother ever entered into any agency relationship, Plaintiff unequivocally attests that his mother never acted on his behalf or under his control in any way, let alone with regard to LMB or its website or services.  Nor is Plaintiff bound as an intended third-party beneficiary to the agreement to arbitrate: LMB fails to demonstrate that the signatories to the agreement intended for Plaintiff to so benefit, and in fact LMB's Terms of Use explicitly state the exact opposite: that no rights or obligations of third parties like Plaintiff arise from the agreement.

Finally, even if LMB could somehow demonstrate that Plaintiff's mother entered into the Terms of Use with LMB (it cannot), and even if LMB then could somehow enforce those Terms of Use against Plaintiff as a non-signatory (it cannot do that either), the Motion would nonetheless fail because the arbitration provision is permeated with procedural and substantive unconscionability and is thus not enforceable.

3

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

LMB cannot compel Plaintiff to arbitrate, and the Motion should be denied.

**BACKGROUND**

LMB operates lead generation websites for subprime mortgage lenders such as Quicken Loan Inc. ("Quicken").  Collectively, LMB and its clients generate leads and aggressively market to those leads in an effort to lure consumers into refinancing homes, taking out other bad loans, and otherwise unnecessarily borrowing money at high interest rates – essentially the same sort of conduct that got the country embroiled in the housing crisis of the mid-2000s.  *See, e.g.,* Angela Koch, "Another Mortgage Crisis — and This One Could 'Quicken' a Downturn," Medium, Oct. 4, 2018, *available at* https://medium.com/@US_moneyreserve/another-mortgage-crisis-and-this-one-could-quicken-a-downturn-dcf8f8793e95 (last accessed May 9, 2019) (referring to LMB as a "multi-lender site[]" for "shadow banks" like Quicken that were "unnamed co-conspirator in the financial crisis"); Julie Creswell, "Quicken Loans, the New Mortgage Machine," The New York Times, Jan. 21, 2017, *available at* https://www.nytimes.com/2017/01/21/business/dealbook/quicken-loans-dan-gilbert-mortgage-lender.html (last accessed May 9, 2019) ("In the years since the crisis, many of the nation's largest banks pulled back their mortgage-lending activities. Quicken Loans pushed in.").

When LMB obtains these "leads," it begins bombarding them with e-mails, phone calls, and, as relevant here, highly-invasive text messages – without any of their prior express written consent and in clear violation of the TCPA.  *See id.* ("Former executives describe Quicken Loans as a technology company that sells mortgages. But the heart that keeps Quicken's blood moving is the 3,500 mortgage bankers who work its phones.").  This is precisely what occurred to Plaintiff and countless other financially-distressed homeowners. Plaintiff brings this action on their behalf to redress LMB's widespread violations of the TCPA.

## I. Procedural History

Plaintiff commenced this class action on January 29, 2019, ECF No. 1, and filed the operative amended complaint March 4, 2019, ECF No. 13.   DMS filed an answer to the amended complaint on March 22, 2019. ECF No. 18.  LMB and CPL filed the present Motion on March 25, 2019.  ECF No. 23.  DMS filed a joinder in LMB and CPL's Motion on April 16, 2019.  ECF No. 26.

## II. Background Facts

To generate leads for Quicken and other subprime mortgage lenders, LMB employs invasive, highly-sophisticated technology on its websites to collect personal information from visitors, including visitors who attempt to use the mortgage calculator tools available on such websites by

4

inputting information pertaining to their homes and existing mortgages. LMB extracts, collects, and analyzes this visitor-inputted information in real time, even where the visitor declines to submit to LMB the information he or she has inputted (by pressing a form-submission button at the bottom of such a page). LMB uses the data it collects from such visitors to identify their cellular telephone numbers (or to identify numbers that it believes belongs to them for those who did not input their numbers into the form), which it sells to Quicken and other subprime lenders, who then along with LMB blasts text messages advertising lending services to these so-called "leads," even though they plainly lack the prior express consent necessary to do so – precisely as experienced by Plaintiff here.

According to LMB, Plaintiff or Plaintiff's mother visited the LMB website LowerMyBills.com in March 2014. Plaintiff unequivocally denies ever visiting that website; Plaintiff's recently deceased mother recalled visiting the website. (Declaration of Bill Hansen ("Hansen Decl."), ¶ 2).) However, as set forth in Plaintiff's declaration submitted together herewith, when asked whether she had ever imputed Plaintiff's telephone number into a form on the website, Plaintiff's mother responded unequivocally and categorically that she had not done so, and that, to the extent she had ever inputted information into such a form, she would have used her own information, not any of Plaintiff's information. (*See id.* ¶ 6.) She also specifically stated that, although she may have visited an LMB website, she was certain that she had never inputted Plaintiff's telephone number or any other telephone number into a form field on such a website. (*Id.*) Plaintiff's mother never pressed the button on LowerMyBills.com website, nor did she ever press any similar such button on any other LMB website. (*See id.*) But Plaintiff nonetheless began receiving LMB's text messages. (*Id.* ¶ 4; *see also* ECF No. 20 at 5, FAC ¶ 14.)

This same experience is shared by numerous others, including Amanda Hill, Amber Pickett, and Carrie Tucker (whose declarations are submitted together herewith as **Exhibit F**). (*See generally, e.g.,* Declaration of Amanda Hill ("Hill Decl."); Declaration of Carrie Tucker ("Tucker Decl."); Declaration of Amber Pickett ("A. Pickett Decl."); *see also* Declaration of Brandon Pickett ("B. Pickett Decl.").) Although some of these individuals inputted information into the form fields on the LMB website, none of them pressed the button on the final page, and yet all of them began receiving unsolicited text messages from LMB and/or Quicken – precisely as experienced by Plaintiff here. (*See id.*) This is no coincidence. This is compelling evidence that LMB has sent millions of text messages to phone numbers that no one submitted to LMB, and that these messages were received by millions of people who never assented to the Terms of Use. Plaintiff is one of these people.

5

Like Plaintiff, Ms. Hill, Ms. Pickett, and Ms. Tucker, numerous other consumers have posted publicly available complaints online about LMB's business practices, as depicted in several screenshots submitted together with this brief (*see* Declaration of David W. Hall ("Hall Decl.") ¶ 6; *id.*, **Exhibit E** (attaching screenshots)), one example of which is depicted below:



★ ☆ ☆ ☆ ☆

**Nikki of White Hall, MD**

Original review: Aug. 11, 2011

I went onto the LowerMyBills.com to compare prices. I was just looking for a mortgage calculator where I could punch numbers into and get ballpark figures from. Their site said it would give me a price online, but before I even finished filling out the online forms, my cell phone started ringing with lenders trying to give me quotes.

(*Id.*, Ex. E at 1.)

Thus, it appears that LMB and/or other affiliated entities use advanced cookie- and data analytics-based algorithms, in conjunction with other data warehouses, to extract all of the data Plaintiff's mother had inputted (but not submitted) in order to associate a name, address, and phone number, even though she had not pressed the button to submit the information.[2]  However, the coup

---

[2]  As LMB's own patents and other public documents explain, its technology is designed to (and does) extract information inputted (but not submitted) by visitors to its website, and then uses that data to locate additional personal information pertaining to those visitors from outside sources, such as credit reports and property records, independent of website visitors filling out the website fields – even if the visitor does not submit the information at the end of the form:

A consumer lead enhancement system comprises a vendor criteria database, a web server, and a matching engine. The vendor criteria database is configured to store vendor criteria for receiving leads regarding consumers. The web server is configured to request from a consumer a first set of consumer characteristics and a second set of consumer characteristics. The matching engine is configured to compare the consumer characteristics with information in the vendor criteria database in order to match the consumer with one or more vendors so that the system is capable of generating a lead and transmitting the lead to the vendors. If the consumer provides the second set of consumer characteristics, the consumer may be matched to vendors based on the second set of consumer characteristics. Otherwise the consumer may be matched to vendors based on the first set of consumer characteristics.

(*E.g.,* U.S. Patent No. 7,778,885, Aug. 27, 2010, a copy of which is attached to the Hall Decl. as **Exhibit A** (Abstract of the '885 patent, assigned to LowerMyBills.com, Inc.).)

And LMB, like Quicken, both of which are subsidiaries of Rock Holdings, Inc., appears to use the same technology as Quicken uses to collect information inputted by visitors to into forms fields on its website, in real time.  Specifically, it has been widely reported that Quicken employs back door wiretapping software on Quickenloans.com to facilitate real-time interception and transmission of visitors' electronic communications as soon as the visitor loads Quickenloans.com or related websites.  (*See, e.g.,* "Before You Hit 'Submit,' This Company Has Already Logged Your Personal Data.", available at https://gizmodo.com/before-you-hit-submit-this-company-has-already-logge-1795906081 (last visited May 9, 2019), a copy of which is attached to the Hall Decl. as **Exhibit B**; *see also Consumerist*, available at https://consumerist.com/2017/06/29/these-forms-collect-your-

6

de grâce came later still, when LMB and/or other affiliated entities began bombarding Plaintiff's cellular telephone number with its invasive text messages.  Simply put: neither Plaintiff nor his mother entered into the Terms of Use, neither agreed to arbitrate anything with anyone, and plainly neither consented to receive text messages from anyone. (*See* Hansen Decl. ¶¶ 2-8.)

But even if LMB could prove that Plaintiff's mother actually clicked the button on the final page of the intake flow on LowerMyBills.com (or any other LMB website), the webpage plainly failed to provide clear and conspicuous notice that she would be agreeing to the Terms of Use by pressing the button. The screenshots of LowerMyBills.com accompanying the Motion reflect an 8-page online mortgage calculator (screenshots of which are attached to LMB's declaration), which claims to be "Completely Free!," repeatedly states "No Registration, No Login Required," falsely promises visitors that "We respect your privacy" when asking for personal contact information (including their names and e-mail addresses), and culminates with a button that states "Click to See Your Free Results!".  Screenshots depicting the first and last pages of this 8-page flow of deception are depicted in pertinent part below:

---

data-even-if-you-dont-hit-submit/ (last visited May 9, 2019), a copy of which is attached to the Hall Decl. as **Exhibit C**. Every keystroke the user and mouseclick is instantaneously intercepted and transmitted through the wiretap. This real-time transmission includes, among other things, information typed on forms located on Quickenloans.com and related websites, regardless of whether the user completes the form or clicks "Submit."  (*See* Hall Decl. Exs. B-C.) As website visitors browse Quickenloans.com and related e-commerce websites, the wiretapping software cross-references the collected information and attempts to "match" website visitors with records of real-life people in back-end databases maintained by data-brokers such as Navistone, Inc. (*See id.*) This matching involves running a database query to correlate the IP address of a website visitor and also matching user profiles through the use of names, addresses, telephone numbers, and other PII. Once a match is found, the software de-anonymizes the user and updates the back-end databases with the user's current browsing activities and PII. (*See id.*) This software continues to monitor the website visitor as he or she browses Quickenloans.com., will report every page visited by the user, and assume that a visitor is interested in applying for a mortgage.  (*See id.*)  Thus, as these articles explain, when filling out forms, any PII the website visitor provides is immediately, automatically, and secretly transmitted in real-time. (*See id.*)

7

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION





PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

(ECF No. 23-3 at 12, 19.)[3]  This sort of "day late, buck short" disclosure is insufficient to manifest assent to the Terms of Use.  Plaintiff's mother did not press the "Click to See Your Free Results!" button (*see* Hansen Decl. ¶¶ 3-4), but even if she did, the configuration and layout of the page failed to clearly and conspicuously provide fair notice of the fine-print disclosures below the button.

Moreover, even assuming Plaintiff's mother had assented to LMB's Terms of Use on this page (and she did not), the plain language of the agreement to arbitrate makes clear that it would only exist as between her and LMB, not between LMB and non-signatories like Plaintiff.  (ECF No. 23-3 at 2 ("The Agreement describes the terms and conditions applicable to your use of the LMB Website and the products and services provided through or in connection with the LMB Website[.]").)

Finally, the arbitration agreement embedded in LMB's Terms of Use is permeated with unconscionable terms, including such one-sided terms as those that would require Plaintiff to arbitrate but not LMB (or any other entity otherwise able to enforce the agreement), prevent Plaintiff from recovering attorneys' fees from LMB but require Plaintiff to pay LMB's fees, bar Plaintiff from recovering any damages, shorten the statutory period for all claims, and the list goes on. (*See id.* at 23-3 at 3 (agreement to arbitrate providing these and other unconscionable terms).)

On this record, the Motion fails as a matter of law for the reasons below.

## LEGAL STANDARD

It is axiomatic that "arbitration is strictly a matter of consent," and thus a "party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016).  Thus, "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court," the party moving to compel arbitration must first prove the existence of "an express, unequivocal agreement to that effect."  *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., In*c., 925 F.2d 1136, 1140-41 (9th Cir. 1991).  In determining whether Quicken has proved that Plaintiff assented to arbitration, courts "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Mun. Water Dist.,* 925 F.2d at 1140-41.  "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Id.* "If there is doubt," arbitration must be denied.  *Id.*

---

[3]   The red rectangular box appearing in the eighth page depicted above, encompassing the "Click to See Your Free Results!" button as well as the microscopic print appearing below the button, was added by LMB prior to its submission to the Court and did not appear on the actual webpage that would have appeared to visitors of LMB's website.

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

**ARGUMENT**

Plaintiff did not agree to arbitrate anything with LMB.  Neither did his mother.  Even if she did, the agreement would not be enforceable against a non-signatory like Plaintiff.  And even in the unlikely event the Court finds both that Plaintiff's mother agreed to arbitrate with LMB and that the agreement is somehow applicable to Plaintiff, the agreement is permeated with unconscionable terms and thus still unenforceable. The Motion should be denied.

**I.      LMB Fails to Prove That Plaintiff Agreed to Arbitrate**

Arbitration can be compelled "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Three Valleys Mun. Water Dist.,* 925 F.2d at 1140-41. "If there is doubt as to whether such an agreement exists," LMB has failed to carry its burden and arbitration must be denied. *Id.* at 1141. Under applicable California law, the "essential elements for a contract" include each party's mutual assent to the contract. *Norcia v. Samsung Tel. America, LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting Cal. Civ. Code §1550).[4]  The Motion fails to demonstrate mutual assent for two reasons: (A) LMB has failed to demonstrate that Plaintiff (or anyone else) clicked the button on the final page of LMB's website, as would be necessary to even potentially bind him to the Terms of Use; and (B) even if Plaintiff or his mother clicked the button (and neither did), they were not put on fair notice of the Terms of Use to which LMB contends they are bound.

**A. LMB Has Not Demonstrated that Plaintiff, His Mother, Or Anyone Else Clicked the Submit Button on LMB's Website**

LMB points to screenshots from its LowerMyBills.com website and a "Click to See Your Free Results!" button on the last webpage as manifesting Plaintiff's assent to LMB's Terms of Service (and the arbitration clause therein).  ECF No. 23-1 at 4.  But LMB presents no evidence whatsoever that Plaintiff ever visited that website, viewed those screenshots, or clicked that button.  Plaintiff, on the other hand, attests unequivocally that he has never visited LowerMyBills.com, has never seen any of those screenshots, has never filled out any information fields or otherwise interacted with that website, and certainly never clicked any button or otherwise submitted any information or agreed to any terms via that website.  (*See* Hansen Decl. ¶¶ 2-3.)  Plaintiff's denial raises issues of fact as to formation, and thus the Motion must be denied. *Three Valleys Mun. Water Dist.,* 925 F.2d at 1141.

---

[4] Even in the context of arbitration, the existent of an agreement is determined by "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995).  California contract law applies here under a "governmental interest approach," *Ashland Chem. Co. v. Provence*, 129 Cal. App. 3d 790, 794 (1982), for Plaintiff's claims arise from text messages received in California. *See Hernandez v. Burger*, 102 Cal. App. 3d 795, 801 (1980).

10

The Honorable Donna M. Ryu of the Northern District of California recently addressed nearly identical circumstances and explained as follows:

> Although Defendants state that the individual who registered Berman's phone number on [their] website agreed to be bound by the terms and conditions, Berman denies having visited the website or having authorized anyone to do so on his behalf . . . In light of Berman's . . . unequivocal denials, and resolving all doubts in Berman's favor, Defendants have failed to show an absence of a genuine issue of fact regarding whether Berman agreed to the terms and conditions . . . As Defendants have not met their burden to show the existence of an agreement to arbitrate . . . the motion to compel arbitration must be denied.

*Berman v. Freedom Financial Network, LLC,* 2018 WL 2865561, at *4 (N.D. Cal. 2018). Same here. Given Plaintiff's unequivocal denials, LMB's Motion must be denied. *Id.*[5]

Well aware that Plaintiff in truth never visited any LMB websites, LMB argues as a fallback that, if not Plaintiff himself, his mother instead must have accessed the LMB website, and if she did, so LMB's argument goes, "she undoubtedly would have accessed the LMB site on [Plaintiff's] behalf." ECF No. 23-1 at 10-11. LMB has no evidence of this either. While Plaintiff's mother did visit the webpage, she did not complete its intake flow, did not submit Plaintiff's telephone number, and did not click the final button. (*See* Hansen Decl. at ¶¶ 5-6.) And LMB's own employee declarant admits they have no direct evidence showing that Plaintiff's mother (or anyone else) clicked the button on the final page of the array of screens that LMB contends she traveled through. *See* ECF No. 23-3 at 3 ("LMB does not capture or retain in session screenshots."). This lack of threshold evidence is fatal to LMB's Motion: LMB cannot prove Plaintiff's mother clicked the button on LMB's say-so alone to establish her assent to the Terms of Use.[6] With not a shred of admissible evidence that

---

[5] *See also Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1228 (N.D. Ill. 2005) (denying arbitration based on website's hyperlinked terms because plaintiff submitted sworn "affidavits that he . . . never visited [Defendant's] website" and thus "raised a triable issue of fact"); *Metter v. Uber Technologies, Inc.*, 2017 WL 1374579, at *4 (N.D. Cal. 2017) (denying motion to compel arbitration given plaintiff's "declaration that he never saw the terms of service" on "the Uber app."); *Van Tassell v. United Marketing Group, LLC*, 795 F Supp. 2d 770, 788 (N.D. Ill. 2011) (denying motion to compel arbitration because plaintiffs claimed in "sworn affidavits [that they] never even viewed the enrollment [webpages] or the relevant Terms and Conditions, let alone agreed to them . . .").

[6] The Court should not consider the statements made by Mr. Viner concerning records that LMB purports to possess, but has failed to submit to the Court, concerning Plaintiff's or his mother's purported interactions with either of the websites. Mr. Viner's statements are inadmissible hearsay and violate the best evidence rule. *See, e.g., Stover-Davis v. Aetna Life Ins. Co.*, 2016 WL 2756848, at *3 (E.D. Cal. 2016) ("On motion to compel arbitration, the court applies a standard similar to summary judgment . . . [thus] the material cited to support to dispute a fact [must] be presented in a form that would be admissible in evidence.") (citing Fed. R. Civ. P. 56(c)); *U.S. v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) ("proponents of computer-produced evidence [] founder on the best evidence

11

Plaintiff's mother actually clicked the final button – coupled with Plaintiff's sworn declaration stating that she did not click that button (as well as the declarations of others with the same or similar experience) – the Motion crumbles under its own premise: if there's no click, then there's no assent.[7]

Nor can it be inferred from LMB having supposedly obtained Plaintiff's or his mother's personal information though its intake websites.  As explained above, the personal information inputted by a visitor in the series of intake fields on the LMB website is <u>collected and stored by LMB and/or other affiliated entities regardless of whether the webpage visitor actually clicks the final button</u>, and is then used by LMB and/or other affiliated entities to automatically tie a name, address, and cellular telephone number with that visitor (as well as to prepopulate similar personal information fields on subsequent visits to LMB-associated websites). *See* ECF No. 23-3 at 5.[8]

LMB's own patented technology is designed to (and does) compile this personal information from outside sources, such as credit reports, property records, and other data sources, including those maintained by Experian, without website visitors having inputted all of their personal information or pressing the final button. *E.g.,* U.S. Patent No. 7,778,885, Aug. 27, 2010, Hall Decl., Ex. A; *see also Kingery v. Quicken Loans, Inc*., 300 F.R.D. 258, 262 (S.D. W. Va. 2014) (describing LMB-related lead processing software, which "contacts third-party vendors to obtain the lead's credit report" and "scrapes the data in the credit report . . . for storage in [LMB-related] database").

This is further confirmed by the sworn declarations accompanying this opposition brief (Hall Decl., Ex. F (Hansen Decl. ¶¶ 2-8; Hill Decl. ¶¶ 2, 4; A. Pickett Decl. ¶¶ 2, 4; B. Pickett Decl. ¶¶ 2, 4; Tucker Decl. ¶¶ 2, 4)), by numerous consumer complaints posted publicly online (Hall Decl., Ex. E), and by the words of LMB's own declarant. (Hall Decl., **Exhibit G** (Declaration of Mr. Viner

---

rule by presenting [] testimony based on  . . . review of computer printouts without actually introducing the printouts themselves . . ."); *Loomis v. Cornish*, 836 F.3d 991, 996-97 (9th Cir. 2016).
[7] *See Smith v. Rent-A-Center, Inc*., 2019 WL 1294443, at *6-*7 (E.D. Cal. 2019) (denying arbitration where declarant "summarily asserted that plaintiff electronically signed the agreement" but failed to substantiate with admissible evidence how he "ascertained that the electronic signature was the act of Plaintiff."); *Ruiz v. Moss Brothers Auto Group*, 232 Cal. App. 4th 836 (2014) (same); *Orsatti v. Quicken Loans, Inc.,* 2016 WL 7650574, at *6 (C.D. Cal. 2016) (denying motion to dismiss because, like here, even if plaintiff partially filled out some information at LMB website, Quicken failed to present evidence that plaintiff "completely fill[ed] out the form").
[8] As the screenshots reflect and LMB's declarant admits, the personal information fields are necessarily populated ***before*** the visitor is presented with any opportunity to click any button agreeing to anything. (*See* Hall Decl., **Exhibit G** (Declaration of Mr. Viner explaining that the LMB website collects and "maintains the data that a consumer enters" and then only if "their answers me[et] certain criteria" are "LMB's disclosures, privacy policy, and terms of use [] presented to the consumer[.]").)

12

admitting that personal information inputted into forms on LMB's websites is automatically collected by LMB and used to automatically prepopulate similar fields on subsequent visits to associated websites, explaining that LMB collects and keeps the "information" of any "consumer [that] had visited an LMB or LMB-powered website in the preceding 60 days" and "if a consumer had visited a website owned or powered by LMB in the preceding 60 days, the consumer would not have to re-enter . . . his or her information."). Thus, whatever personal information is inputted, it is collected and stored by LMB regardless of whether the visitor actually inputs all their information and regardless of whether the visitor clicks the button. Here, LMB's records fail to show that Plaintiff, his mother, or anyone else hit the "Click to See Your Free Results!" button or any other button. Because LMB has failed to prove that Plaintiff or his mother assented to the Terms of Use, LMB has failed to demonstrate the existence of a contract to arbitrate.[9] The Motion should be denied. *Three Valleys Mun. Water Dist.,* 925 F.2d at 1140-41 (if any "genuine issue of fact," motion must be denied).

## B. LMB's Website Fails to Put Visitors on Fair Notice of the Terms of Use

But even if LMB had proved that Plaintiff's mother clicked the submission buttons (not so), that would still fail to establish her assent to LMB's Terms of Use. Plaintiff's mother could not have assented to the Terms of Use because they are not clearly and conspicuously displayed to visitors.

Companies like LMB that seek to enforce the terms of an online take-it-or-leave-it contract bear the burden of establishing, on undisputed facts, that the contract provisions were clearly communicated and accepted. *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("onus must be on website owners to put users on notice of the terms," for "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound"). Determining whether "web pages presented to the consumer adequately communicate all the terms and conditions" and "whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms" is "a fact-intensive inquiry," *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034-35 (7th Cir. 2016). It "depends heavily" on "the design and content" of the webpages. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016).

Here, the design and content of the proffered screenshots come nowhere close to demonstrating anyone's assent to LMB's Terms of Use. The LowerMyBills.com screenshots reflect

---

[9] At the very least, the conflicting evidentiary record before the Court on the issue of mutual assent – a fundamental element to the formation of any contract – leaves a genuine issue of fact as to whether Plaintiff's mother or anyone else formed a contract (i.e., the Terms of Use) with LMB in the way LMB says they did.

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

nothing more than an 8-page online mortgage calculator that purports to be "Completely Free!" and require "No Registration, No Login." (ECF No. 23-3.)  The first seven pages comprise a series of dropdown form fields from which visitors can select prepopulated answers (answers which LMB collects in real time, before the final button is pressed) (*id.* at 12-18), followed by a button labeled "Continue" – each of these pages lacks any indication that an agreement is being offered, any request for assent to any terms, or any mechanism to assent to any such terms.  (*Id.*)  The eighth and final page asks for the visitor's name, phone number, and street address – data which LMB collects in real time as it is inputted, even if the form is never submitted.  (*Id.* at 19.) At the bottom of this eighth page is the final button labeled "Click to See Your Free Results!" – presented to the visitor without any mechanism requiring the visitor to affirmatively agree to any contractual terms, be it by a button, a checkbox, or an electronic signature, and without any clear, conspicuous, or prominent indication that by pressing the button the visitor would be agreeing or otherwise assenting to any terms.[10]

Only well below the innocuous "Click to See Your Free Results!" button, in tiny, light grey-colored fine print, dwarfed by the foregoing colorful questions, advertisements, and button and nearly indecipherable against the already lightly-colored background, does the website make its first and only purported reference to LMB's Terms of Use (text which LMB was tellingly forced to magnify in order to make it even somewhat legible prior to submitting it to the Court (ECF No. 23-3 at 20)). Even that hidden reference to the "Terms of Use" in that belated disclosure language comes as just three words buried in a rambling, nearly-hundred-word diatribe, addressing a hodgepodge of topics bearing no relation to the subject of the webpage or the "results" to be "seen" if the button is clicked. (*Id*. at 19.)  Rather than addressing any of the important provisions of the Terms of Use – pertaining to arbitration, waivers of jury trials, or the like – this block instead distracts visitor with topics ranging from the LMB Partner Network to the national Do Not Call Registry and so on.  (*Id*.)

Such disclosures, and the way in which they are presented, are offensive to any consumer's reasonable expectation of due process and fair play.  They are unapparent unless visitors ferret them out among the countless far more prominent and distracting questions, graphics, advertisements, buttons, and the like cluttering the pages, all rendering them incapable of clearly and conspicuously communicating anything to any visitor, as a matter of law. *See Cullinane v. Uber Technologies, Inc.*,

---

[10] And critically, as discussed at length above, the information inputted by the visitor into the form has already been collected for exploitation by LMB and other affiliated entities even if the visitor declines to press the button (or even submit the information on the final page).

14

893 F.3d 53, 63 (1st Cir. 2018) (inadequate where "presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention"); *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *2 (N.D. Cal.) (no assent where terms "never appear[ed] in the text, sidebar, or at the top of the webpage prior to" button); *Starke v. SquareTrade, Inc*., 913 F.3d 279, 293 (2d Cir. 2019) (same); *Sgouros*, 817 F.3d at 1036 (clicking button cannot suffice where notice is interspersed with text that "distracted" website visitors). "[T]here is no reason to assume that viewers will scroll through to subsequent" text simply because it's there.  *Specht v. Netscape Communications Corp*., 306 F.3d 17, 32 (2d Cir. 2002).

The Ninth Circuit and the rest of the federal judiciary is in near uniform agreement that such "browsewrap" configurations fail to provide adequate notice of contractual terms and are thus incapable of establishing mutual assent to such terms, as a matter of law.[11]  *See Nguyen*, 763 F.3d at 1177-78. Even "a consumer's clicking on a . . . button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the . . . button would signify assent to those terms." *Specht*, 306 F.3d at 29-30. The layouts of LMB's pages fall far short of providing the notice required to establish assent. The Motion should be denied.[12]

## II.    Even If an Agreement Existed, It Would Not Be Enforceable Against Plaintiff

Even assuming LMB were able to demonstrate Plaintiff's mother assented to the Terms of Use (it has not and cannot), LMB's Terms of Use would not be enforceable against a non-signatory

---

[11] LMB's motion implies LMB's screenshots reflect a "clickwrap" process.  (ECF No. 23-1 at 11-13.  Not so.  Unlike the LMB configuration, a clickwrap agreement requires users to "click an 'I agree' box after being presented with a list of terms and conditions of use." *Nicosia*, 834 F.3d and thus "force[s] users to 'expressly and unambiguously'" manifest assent before "being given access to the product." *Id.* (quoting *Register.com*, 356 F.3d at 429).  In contrast, LMB's configuration does not force the website visitor view the terms and check an "I agree" box before being given access.  Even LMB's chief (albeit largely unpersuasive) authority, *Rodriguez v. Experian Servs. Corp.,* No. 2:15-cv-03553-R-MRW, ECF No. 43 (C.D. Cal. Oct. 5, 2015), contradicts LMB and instead accurately describes LMB's intake pages as "browsewrap," not clickwrap.  Still, once the plainly erroneous formation and unconscionability analyses in *Rodriguez* were thoroughly briefed on appeal before the Ninth Circuit, defendants not surprisingly settled rather than face impending reversal.  *Rodriguez* as a whole is rife with error, unpersuasive for all the reasons detailed herein, would surely have been reversed had defendant not paid off the plaintiffs in that case, and thus, contrary to LMB's suggestion, should not be relied on here. *Cf.* ECF No. 23-1 at 11, 13-14.

[12] Unlike here, in LMB's cited cases the contractual significance of the buttons a user would click was plain from the text of the button itself. *Compare Mohamed v. Uber Technologies, Inc.*, 109 F. Supp. 3d 1185, 1191-92 (N.D. Cal. 2015) (button labeled "Yes, I agree"); *Fteja v. Facebook*, 841 F. Supp. 2d 829, 825 (S.D.N.Y. 2012) ("Sign Up"); *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *1 (S.D. Cal. 2014) ("Place Order"), *with Savetsky v. Pre-Paid Legal Services, Inc*., 2015 WL 604767, at *4 (N.D. Cal. 2015) ("More Plan Details" does not indicate assent to website terms and conditions); *Motley v. Contextlogic, Inc*., 2018 WL 5906079, at *2 (N.D. Cal. 2018) ("Click here for more details" did not indicate assent to mobile app terms of service).

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

like Plaintiff.  Nearly always, "only signatories to an arbitration agreement" are bound by it.  *Murphy*, 724 F.3d at 1239.  Well aware that Plaintiff is not a signatory, LMB invokes three narrow non-signatory exceptions: (A) equitable estoppel; (B) agency; and (C) third-party beneficiary.  None of these exceptions is even remotely applicable here.

### A.  Equitable Estoppel Does Not Apply

"[E]quitable estoppel of third parties in this context is narrowly confined."  *Id*.  It could only apply if Plaintiff "knowingly exploit[ed]" LMB's Terms of Use for his "direct benefit."  *See Comer v. Micor, Inc*., 436 F.3d 1098, 1102 (9th Cir. 2006).  Equitable estoppel never applies to non-signatories who are mere "passive participant[s]" to a purported agreement.  *Id*.  But Plaintiff has not knowingly exploited or directly benefited from LMB's Terms of Use. Plaintiff alleges only statutory TCPA claims that have nothing to do with any term or obligation under LMB's Terms of Use.  Nor has Plaintiff otherwise invoked any term or obligation under LMB's Terms of Use.  Plaintiff attests he has never visited any LMB-related website, participated in any LMB-related referral service, or entered into any agency or other relationship with his mother or anyone else related in any way to LMB or any LMB affiliate.  (Hansen Decl. at ¶¶2-8).  Plaintiff further attests that he was never aware of any agreement between his mother and LMB or any LMB affiliate, any other connection between his mother and LMB, or any connection between any loan or related offer related to LMB.  (*Id*.)

Nor has Plaintiff benefited directly from any such agreement. LMB must prove that any purported benefits to Plaintiff were "direct, which is to say, flowing directly from the agreement." *Bridge v. Credit One Financial*, 294 F. Supp. 3d 1019 (D. Nev. 2018).  LMB can point to no benefit flowing to Plaintiff directly from LMB's Terms of Use.  Instead, LMB resorts to attenuated "benefits": that Plaintiff refinanced his home with a loan from a third-party, mortgage lender.  But that refinance loan arises directly from an independent contract between Plaintiff and the lender, not LMB's Terms of Use or any purported agreement between Plaintiff's mother and LMB.  Such attenuated "benefits" have been rejected by courts nationwide.  In *Pereira v. Santander Consumer USA, Inc*., the plaintiff's husband obtained a loan, "defaulted on his loan obligations," and then the defendant allegedly called the plaintiff's cell phone "in an effort to collect payments due under the loan agreement." 2012 WL 4464893, at *1 (N.D. Ill. 2012). The defendant argued, under equitable estoppel, that the plaintiff was bound by an arbitration provision in the loan agreement her husband signed.  *Id*.  The court rejected defendant's argument in resounding terms:

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

1
2
3
4
5
6
7

> This benefit is legally insufficient to compel arbitration. Estoppel bars a party who claims the direct benefit *of a contract* from asserting that she is not bound by the arbitration clause contained in that contract. In other words, a party will be estopped from refusing to arbitrate while simultaneously seeking to enforce another provision in the contract containing the arbitration provision ... Here, [the plaintiff] is not seeking to enforce any provision of [her husband's] loan agreement. Her complaint, which alleges a violation of the TCPA, makes no mention of [her husband], the automobile, or the loan agreement. The alleged use of [her husband's] automobile is a benefit far too removed from the agreement for this Court to compel arbitration. "Sometimes I've believed as many as six impossible things before breakfast." Lewis Carrol, Through the Looking Glass 45 (1st Edition Media 2009). Not today.

8
9
10
11
12

*Id.* So too, here, Plaintiff's allegations make no mention of his mother, any agreement between his mother and LMB, or any referral service his mother may have engaged at any time. Having refinanced one's home with a mortgage lender that, unbeknownst to you, potentially received a third-party lead generated in response to another third party that, unbeknownst to you, potentially visited yet another third party's lead generation website is surely a "benefit far too removed from the agreement for this Court to compel arbitration." *Id.*[13]

13
14
15
16
17
18
19
20
21
22

Nor do Plaintiff's non-contract, statutory TCPA claims "touch matters covered by the contract containing arbitration clause," simply because LMB intends to assert a consent affirmative defense premised on its Terms of Use. *See* ECF No. 23-1 at 14. The Ninth Circuit has rejected identical arguments. *See Rahmany v. T-Mobile USA Inc.*, 717 Fed. Appx. 752, 753 (9th Cir. 2018) (equitable estoppel cannot apply to TCPA claims even where defense of consent turns on purported contract). As the Ninth Circuit explained in *Murphy*, "[e]ven if [a defendant] is correct that Plaintiffs' claims on some abstract level require the existence of the [contract], the law is clear that this is not enough for equitable estoppel." 724 F.3d at 1230. Always, the "*sine qua non* . . . is that the claims the plaintiff asserts . . . are dependent on or inextricably bound up with the contractual obligations." *In re Henson*, 869 F.3d 1052, 1061 (9th Cir. 2017). Plaintiff's TCPA claims do not depend on LMB's Terms of Use, at all. *Cf.* ECF No. 23-1 at 11, 14-15. Thus, equitable estoppel does not apply here.

**B.  No Agency Relationship Existed Between Plaintiff and His Deceased Mother**

23
24
25
26
27

---

[13] *See also Pyciak v. Credit One Bank, N.A.*, 2018 WL 4787660, at *3 (E.D. Mich. 2018) (refusing to enforce arbitration of non-signatory plaintiff's TCPA claims; even though his wife was signatory to agreement with defendant credit card company); *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063-64 (7th Cir. 2018) (non-signatory daughter's TCPA claims not bound by arbitration provision in mother's credit card agreement); *Brown v. Credit One Bank, N.A.*, 2018 WL 1697801, at *2-*3 (D. Nev. 2018) (no arbitration of non-signatory's TCPA claims even though her husband was signatory).

28

**PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION**

1   Grasping at straws, LMB speculates that because Plaintiff and his mother at one time owned
2   a home together in joint tenancy, Plaintiff must have entered into an agency relationship with his
3   mother, whereby she assented to online adhesion contracts on his behalf.  ECF No. 23-1 at 11.
4   Nonsense.  LMB presents no evidence whatsoever that Plaintiff ever knowingly (or otherwise)
    entered any sort of agency relationship with his mother. LMB simply pronounces *ipse dixit* that "if
5   his mother, Willena, went to LMB's website," it "presumably was with his consent and
6   authorization." ECF No. 23-1 at 11. Agency cannot be established on LMB's speculation alone.  *See*
7   *Murphy*, 724 F.3d at 1232-33 (refusing arbitration of non-signatory on agency theory because movant
8   "presented no evidence" that purported principal controlled purported agent). Certainly not here,
9   where Plaintiff attests that he never entered into any agency relationship with his mother, that she
10  never acted on his behalf or under his control in any respect, let alone in relation to LMB or any
    LMB-related website or affiliate, in relation to any mortgage or property, or in relation any online
11  referral service, website terms of use, or any other purported contract or service.  *See* Hansen Decl.
12  ¶¶5-8; *see also Roes v. SFBSC Management, LLC*, 656 Fed Appx. 828 (9th Cir. 2016) (affirming
13  denial of arbitration under agency theory given conflicting declarations regarding extent of control).
14       In any event, the "formation of an agency relationship is bilateral matter," it "cannot be created
15  by the conduct of the agent alone; rather conduct by the principal is essential to create the agency."
16  *Flores v. Evergreen at San Diego, LLC*, 148 Cal. App. 4th 581, 587-588 (2007).  LMB presents no
    evidence of any conduct by Plaintiff (the purported principal); rather, LMB relies entirely on
17  unsubstantiated conduct by Plaintiff's mother (the purported agent). As such, even were it
18  substantiated, LMB's speculative hypothetical would not establish an agency relationship. *Id.* (mother
19  did nothing to indicate daughter had authority to agree on mother's behalf); *Stiner v. Brookdale Senior*
20  *Living, Inc.*, 354 F. Supp. 3d 1046, 1055 (N.D. Cal. 2019) ("offered no evidence that [father] . . .
21  caused [defendant] to believe [his son] was acting as his agent")
22       **C.  Plaintiff Is Not an Intended Third-Party Beneficiary of LMB's Terms of Use**
23       Nor is Plaintiff an intended third-party beneficiary of LMB's Terms of Use.  *Cf.* ECF No. 23-
24  1 at 11.  "The test for determining whether a contract was made for the benefit of a third person is
    whether an intent to benefit [that] third person appears from the terms of the contract."  *Balsam v.*
25  *Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010).  And as the Ninth Circuit and California courts
26  have repeatedly admonished, "indirect reference to a third party does not make the third party a
27  beneficiary of the [contract]." *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013).
28

18

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

Nor does the "mere fact that a contract results in benefits to a third party [] render that party a third-party beneficiary." *Murphy*, 724 F.3d at 1234.  LMB must prove that each party to the agreement "expressly intended" both "that the [Plaintiff] would benefit" and "that the promisor assume a direct obligation to the intended beneficiary [*i.e.*, Plaintiff]."  *Rajagopalan*, 718 F.3d at 847.

Here, LMB offers no evidence that any party to the LMB Terms of Use intended Plaintiff to benefit, no evidence that Plaintiff assumed any direct rights or obligations to LMB, or anyone else under LMB Terms of Use, and certainly no evidence that LMB assumed any "direct obligation" to Plaintiff. *See Rajagopalan*, 718 F.3d 844; *Britton v. Co-Op Banking Group*, 4 F.3d 742, 745 (9th Cir. 1993).  To the contrary, in the section "Dealings with Third Parties," LMB's Terms of Use categorically carve out third parties, stating any "dealings with any third parties . . . [are] solely between [the user] and such third party." (ECF No. 23-3 at 31.) The "plain language of the [contract] explicitly and unambiguously relinquishes all third-party rights."  *Balsam*, 627 F.3d at 1161.

**III.    The Arbitration Agreement is Unconscionable**

Finally, even if LMB had proved both Plaintiff's mother's assent and some legitimate ground binding non-signatories like Plaintiff (LMB has done neither), the agreement to arbitrate in LMB's Terms of Use would still be unenforceable because it is permeated with unconscionability.  "Under California law, an arbitration agreement . . . is unenforceable if it is both procedurally and substantively unconscionable." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010); *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013) ("core concern" is "absence of meaningful choice").  Procedural focuses on "surprise and oppression in the contracting process." *Pokorny*, 601 F.3d at 996. Substantive focuses on "unfairly one-sided" results. *Little v. Auto Stiegler, Inc.,* 29 Cal.4th 1064, 1071–72 (2003).  While both "are required, 'they need not be present to the same degree.'" *Colvin v. NASDAQ OMX Group, Inc.,* 2015 WL 6735292, at *3 (N.D. Cal. 2015).

LMB's arbitration clause is egregious on both counts. Procedurally, it is a contract of adhesion against a consumer with no opportunity to negotiate; it was drafted solely by LMB, a large, well-funded corporate entity with superior bargaining power, and imposed take-it-or-leave-it via inconspicuous websites designed to distract consumer from its terms. Worse, it targets financially distressed consumers desperate for debt relief, precisely to generate vulnerable leads ripe for exploitation by predatory subprime lenders.   These oppressive circumstances alone establish

19

procedural unconscionability. *Pokorny*, 601 F.3d at 996.[14]  Surprise too:  LMB failed to even "attach the arbitration rules" to its Terms of Use and thereby "denied the [Plaintiff] 'a fair opportunity to review the full nature and extent of the non-binding conciliation and binding arbitration processes to which [she] would be bound.'" *Vargas*, 2016 WL 946112, at *10.[15]

It is also substantively unconscionable. LMB provides Plaintiff no consideration; although Plaintiff must arbitrate any claims against LMB, LMB (or any other entity) need not arbitrate claims against Plaintiff, (*see* ECF No. 23-3 at 29).  *Armendariz v. Found'n Healthy Psychcare Servs. Inc.*, 24 Cal. 4th 83, 120 (2000) (lack of mutual consideration for arbitration provision unconscionable). Plaintiff is afforded no means to choose, much less contest, the pool of arbitrators.  *Moreno*, 311 P.3d at 207 ("adhesive agreement that gives [defendant] the right to choose a biased arbitrator is unconscionable."); *Newton v. American Debt Services, Inc.*, 549 Fed. Appx. 692, 694 (9th Cir. 2013) ("reserve selection of arbitrator").  Yet Plaintiff is forced to both indemnify LMB for any "attorneys' fees" and preemptively release any potential liabilities, legal fees, or costs owed by LMB.  *Id.* at 694 ("limit damages").  This sort of one-sided "loser pays" consequence is unconscionable. *Pokorny,* 601 F.3d at 1004 (one-way fee-shifting).  It also gives LMB unilateral right to modify "without notice" to Plaintiff, *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir. 2003) ("unilateral power to terminate or modify"), yet releases Plaintiff's claims, bars any damages, and shortens the every limitations period. ECF No. 23-3 at 30-32. These provisions are unconscionable.[16]  Because LMB's arbitration agreement is permeated by unconscionable terms, it is unenforceable under California law and the Motion should be denied. *Armendariz*, 24 Cal. 4th at 124 (more than one unconscionable provision renders agreement "permeated by an unlawful purpose" such that it cannot be severed).[17]

## CONCLUSION

For each of the foregoing reasons, the Motion should be denied.

---

[14] *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 983 (9th Cir. 2007) ("reject[ing] notion that the existence of 'market alternatives' bars a finding of procedural unconscionability"); *Higgins v. Superior Court*, 140 Cal. App. 4th 1238, 1252 (2006) (unsophistication of party).

[15] *Trivedi v. Curexo Tech. Corp.*, 189 Cal. App. 4th 387, 393 (2010) ("failure to provide a copy of the arbitration rules"); *Harper v. Ultimo*, 113 Cal.App.4th 1402, 1406 (2003) (gives "a nasty shock").

[16] *Newton*, 549 Fed. App'x. at 694 (limit damages); *Circuit City Stores, Inc. v. Adams*, 279 F.3d at 894 (same); *Davis*, 485 F.3d at 1076-77 (shorten statute of limitations).

[17] Since LMB has failed to carry its burden of proving the existence of an enforceable agreement to arbitrate, this proceeding is not "referable to arbitration" and thus no stay or dismissal pending arbitration is warranted.  *See* 9 U.S.C. § 3.  To the extent the Court finds that an issue of fact exists as to whether LMB has met its burden to demonstrate the existence of a contract to arbitrate, Plaintiff is entitled to and requests discovery and trial by jury. *See* 9 U.S.C. § 4.

20

**PLAINTIFF BILL HANSEN'S OPPOSITION TO**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

Dated:  May 17, 2019

Respectfully submitted,

**HEDIN HALL LLP**

By: /s/ Frank S. Hedin
           Frank S. Hedin

Frank S. Hedin (SBN 291289)
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-mail: fhedin@hedinhall.com

**HEDIN HALL LLP**

David W. Hall (SBN 274921)
Four Embarcadero Center, Suite 1400
San Francisco, California 94111
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
E-mail: dhall@hedinhall.com

*Counsel for Plaintiff and Putative Classes*

21

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2019, a true and correct copy of the foregoing was served by electronic service via the Court's CM/ECF service on all counsel or parties of record on the service list in the above-captioned action.


/s/ David W. Hall
David W. Hall

PLAINTIFF BILL HANSEN'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION